UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DENNIS K. BROWN, et al., | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 13-6455 |
| v. | : | |
| MOUNT LAUREL TOWNSHIP, et al., | : | OPINION |
| Defendants. | : | |

Plaintiffs Dennis Brown (in his own right and on behalf of the Estate of David Brown) and Dorothy Brown (in her own right and on behalf of the Estate of David Brown) (collectively Plaintiffs), bring this civil rights complaint naming several members of the New Jersey State Police and others and members of the Mount Laurel Township Police Departments Defendants.[1]  Currently before the Court are five motions.  Both the State

_____

[1] The New Jersey State Defendants are as follows: Barlow, Botti, Bucchere, Byrne, Carnival, Crutchley, Cacchiara, D'Angelo, DiPaola, Fiorello, Fowler, Gallagher, Georgeson, Gorman, Graeber, Hendrickson, Hoppe, Kersetter, Klagg, Lawyer, Leone, Logan, Paret, Perry, Poskay, Poulton, Reader, Rodcap, Stickel, Stohanov, Vega, Walsh, as well as against individuals identified by their badge number: 5705, 5617, 6087, 6122, 6274, 6581, 6217 (collectively "State Defendants").  The Mount Laurel Defendants are as follows: Richard Carp, Mark Colligan, Michael Cresong, Dennis A. Cribben, Earl Dever, Aaron Diperi, Aaron Harty, Glen Horay, Daniel Howard, Corey Jones, John Lake, Brian Michigan, Paul Modugno, Mount Laurel Township, Ryan Orange, Jeffrey Palladino, Edward Pincus, Stephen Riedener, William Rudderow, Dean Rutkowski, and Thomas Shinn (collectively "Mount Laurel Defendants").

Defendants and the Mount Laurel Defendants move, separately, to dismiss the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). State Defendants move, pursuant to L. Civ. R. 5.2(e), to seal certain documents attached to its brief in support of its motion. Plaintiffs move to dismiss State Defendants' motion to dismiss and separately seek permission to file a sur-reply in opposition to State Defendants' motion to dismiss.[2]

The Court held a hearing on September 12, 2016 at which time the Court granted the motion to seal and granted the Defendants' motions as to Plaintiffs' claims against the individual Defendants in their official capacities. For the reasons expressed on the record that day and for those that follow, State Defendants' motion to seal is granted, State Defendants' Motion to Dismiss is granted in part and denied in part, Mount Laurel Defendants' Motion to Dismiss is granted in part and denied in part and Plaintiffs' Motions to dismiss and for permission to file a sur-reply are, respectively, denied and dismissed as moot.

## I.    General Background

Plaintiffs allege that from the late evening of October 27, 2011 into the morning of October 28, 2011, members of the New Jersey State Police, and several members of the Mount Laurel Police Department were involved in a

---

[2] Plaintiffs' Motion to dismiss State Defendants' motion to dismiss is denied. Plaintiffs' motion for permission to file a sur-reply in opposition to State Defendants' Motion to dismiss is dismissed as moot.

stand-off type situation with the deceased, David Brown ("Decedent").  The incident began when Decedent's telephone conversation with his brother Harry Brown caused Harry concern that Decedent was suicidal. (Second Amended Complaint "SAC" ¶68).  Harry spoke with their mother, Dorothy Brown, and Dorothy spoke with Decedent by phone.  Id. at ¶69.  When Harry went to his brother's residence at some point before midnight, Decedent answered the door carrying a .38 caliber pistol.  Id. at ¶71.  The brothers watched television and Harry coaxed Decedent into putting the gun away.  Id. at ¶¶71-72.  Several hours passed and Harry eventually left his brother.  Id.  As he exited the residence he heard a single bang sound and, at the time, believed the sound to be a gunshot.  Id. at ¶73.  Harry re-entered the house and started to the bedroom, only to find the door locked.  Id.

Harry sent a text-message to Michael Radano, a friend of Decedent.  Id. at ¶74.  Radano worked in a mental facility and Harry informed him that Decedent had discharged a gun and asked for assistance.  Id.  As Harry waited for Radano, he entered the bedroom and found Decedent holding the same .38 caliber pistol and appearing to be in a daze; Harry thought the daze could be the result of Xanax.  Id. at ¶75.  When Radano arrived, Decedent became upset and went down stairs to look at Radano's vehicle.

Id. at ¶¶75-77.  At this point, Harry took possession of the .38 caliber pistol and noticed that it was cool, indicating to him that this gun had not recently been fired as he first believed.  Id.

Decedent told Radano he was not welcome; apparently the two were no longer on friendly terms.  Id. at ¶80.  Radano persisted and accompanied Harry into the residence and upstairs, but the door to Decedent's room was closed.  Id. at ¶82.  Neither man attempted to open to door. Id.

It is alleged that Radano did not want to leave Decedent alone and asked Harry to retrieve the gun.  Id. at ¶83.  Radano took the gun and locked it in his car and told Harry they needed to call the police.  Id. at 84. Although Harry insisted the police would make matters worse, Radano called "911" while Harry went back inside to check on Decedent. Id.  By now, it was approximately 4:20 a.m. on October 28, 2011.

In its attempt to distinguish facts, highlight contradictions, and challenge the information given to the police, the Complaint makes reference to several police reports and accounts for the purpose of putting the events into a timeline.[3]  In this regard, the Complaint avers that the

---

[3] "Although a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered

Burlington County Central Communications reported that the "911" caller stated that Decedent had "locked himself inside a bedroom," that he "had access to weapons," and that the caller had already seized one of the weapons." Id. at ¶86.  As a result, two Mount Laurel Police Officers, Orange and Rutkowski, were dispatched to Decedent's residence. Id. at ¶87.

The Complaint further attempts to posit narratives from some of the Defendants, without identifying the source of the report.  In this manner, the Complaint claims that Orange's narrative includes an admission by Harry that Decedent answered the door holding a gun and that when he left the home, Harry heard a loud bang that he believed to be a gunshot and that Harry took the weapon from Decedent.  Id. at ¶93. In addition, Orange was told by Harry that Harry could not find a bullet hole from the loud bang he heard and that Harry now theorizes that the loud bang could have been from a "firecracker" or "his brother punching the wall." Id.  Although

---

without converting the motion to dismiss into one for summary judgment." U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (internal quotation marks and citations omitted) (emphasis deleted).  Accord Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004) (citations omitted). In this regard, Plaintiffs' confusing incorporation of police narratives to shape and challenge the events leading up to Decedent's death raises a question as to whether Plaintiffs rely on these documents in a manner that permits the Court to consider the facts therein on this motion.  Because the Complaint is drafted in a manner which disputes certain information relied upon by the police, the Court will not consider these documents under this exception to the Rule 12(b)(6) standard.

the Complaint avers that Harry willingly shared that Decedent was recently suffering from depression, it specifically disputes that Harry told Orange that Decedent also suffered from schizophrenia. Id. at ¶¶95-97.  Rather, Harry relayed that an uncle suffered from schizophrenia. Id. at ¶¶97. According to the Complaint, Orange was unwilling to accept Harry's explanation that the loud bang emanated from something other than a gun.

At 4:40 a.m., Decedent closed the front door to the house and members of the New Jersey State Police Crisis Negotiation Team ("CNT") and Technical Emergency and Mission Specialists ("TEAMS") unit were summoned to the scene.  Id. at ¶¶104-107.   The Complaint states that the "decision to summon the T.E.A.M.S. Unit and the approval of same the above officers was made without the information, inquiry, and analysis necessary to determine whether summoning T.E.A.M.S. Unit was necessary or appropriate at this time based on the information known to police; particularly Harry Brown's explanation that a gun was never fired inside the home. Id. at ¶105.   Over the next hour and a half, several different tactical units arrived at the scene and at 6:05 a.m. the T.E.A.M.S. Unit moved the Ballistics Engineered Armored Counter Attack Truck ("BEARCAT") onto the front law of the residence.  By 4:40 a.m. members of CNT and TEAMS units were summoned to the scene. Id. at ¶121.  By this

time a "battle plan" was formed to show a "threat of overwhelming military-type force[.]" <u>Id.</u> at ¶120.   Several large black SUVs arrived and the officers present created a hard perimeter around the residence. <u>Id.</u> No one from Decedent's family was allowed to communicate with or approach Decedent, including Dorothy Brown who arrived after the BEARCAT. <u>Id.</u> at ¶¶102-103; ¶132.  At this point, Decedent remained in the house and at approximately 7:30 a.m. several canisters of chemical munitions were sent into the house.  <u>Id.</u> at ¶140.  Then, the Complaint avers the following:

> State police Documents claims that [Decedent] fired several shotgun rounds through this bedroom window over the BEARCAT at 7:36 a.m.  Plaintiffs believe that *if* any such shots were fired, these were intended to introduce air into the bedroom to counteract the effects of the chemical munitions, which made the atmosphere in the residence unbreathable, so that [Decedent], fearing he would be shot by police if he left the residence, could stay in the residence[.]"

<u>Id.</u> at ¶141.

According to the Burlington County Medical Examiners, Decedent took his own life and cause of death was confirmed by a self-inflicted gunshot wound to the head. (Ex. A, Burlington County Medical Examiner's report; SAC ¶149). The Complaint disputes this conclusion.

Plaintiffs allege a number of claims against State Defendants and the Mount Laurel Defendants stemming from the incident.

## II.    Procedural History

Plaintiffs filed their complaint initial on or about October 25, 2013. (Dkt. No. 1). However, the complaint lacked a proper electronic signature and a signed complaint was filed on February 27, 2014. (Dkt. No. 3). On April 2, 2014, Fuentes, McNulty, Wilson, and the Crisis Team filed a motion to dismiss the complaint.  (Dkt. No. 12).   On November 25, 2014, Plaintiffs were ordered to file an amended complaint and did so on January 20, 2015. (Dkt. Nos. 32, 41).  On or about February 12, 2015, State Defendants were served with a copy of the complaint.  State Defendants thereafter filed a motion to dismiss. (Dkt. No. 93).   On December 17, 2015, Plaintiffs' were granted leave to file their Second Amended Complaint. (Dkt. No. 110).  The claims are as follows.

> **COUNT I:** VIOLATIONS OF FOURTH AMENDMENT SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 Against Defendants Jones; Orange; Rutkowski; Harty; Cresong; Colligan; Cribben; Modugno; Howard; Riedener; Dever; Pincus; Colligan; Palladino; Rudderow; And Police Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9, And John Doe 10 Of The Mount Laurel Township Police Department;
>
> **COUNT II:** VIOLATIONS OF FOURTEENTH AMENDMENT SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 Against Defendants Jones; Orange; Rutkowski; Harty; Cresong; Colligan; Cribben; Modugno; Howard; Riedener; Dever; Pincus; Colligan; Palladino; Rudderow; And Police Officers John Doe 1, John Doe 2, John Doe 3, John Doe 4,

John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9, And John Doe 10 Of The Mount Laurel Township Police Department;

**COUNT III**: VIOLATIONS OF FOURTH AMENDMENT SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 against Defendants Diperi, Palladino, Carp, Michigan, And Howard;

**COUNT IV:** VIOLATIONS OF FOURTEENTH AMENDMENT SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 Against Defendants Diperi, Palladino, Carp, Michigan, and Howard;

**COUNT V:** VIOLATIONS OF FOURTH AMENDMENT SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 against C.N.T. Unit Defendants; Defendants Dipaola, John Doe No. 42, John Doe 43, And John Doe 44; T.E.A.M.S. Central Defendants; T.E.A.M.S. South Defendants; Defendants Botti, Bucchere, Poulton, Klagg, Perry, Fiorello, Stickel, And Lawyer; And Defendants John Doe No. 45, John Doe No. 46, John Doe No. 47, John Doe No. 48, John Doe No. 49, And John Doe No. 50;

**COUNT VI:** VIOLATIONS OF FOURTEENTH AMENDMENT SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 against C.N.T. Unit Defendants; Defendants John Doe No. 42, John Doe No. 43, And John Doe No. 44; T.E.A.M.S. Central Defendants; T.E.A.M.S. South Defendants; Defendants Botti, Bucchere, Poulton, Klagg, Perry, And Fiorello; And Defendants John Doe No. 45, John Doe No. 46, John Doe No. 47, John Doe No. 48, John Doe No. 49, And John Doe No. 50;

**COUNT VII:** VIOLATION OF FOURTH AMENDMENT SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 against T.E.A.M.S. Centrial Defendants; T.E.A.M.S. South Defendants; Defendants Leone, Barlow, Hoppe, Georgesion, Carnival, Stojanov, Paret, Gorman, John Doe 39, John Doe 40, John Doe 41, John Doe. 42, John Doe 43, John Doe 44, John Doe 45, John Doe 46, John Doe 47, John Doe 48, John

Doe 49, John Doe 50, Bucchere, Poulton, Klagg, Perry, Fiorello, Jones, Orange, Rutkowski, Harty, Cresong, Colligan, Deperi, Lake, And Palladino;

**COUNT VIII**: CONSPIRACY TO VIOLATE FOURTH AMENDMENT SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 against C.N.T. UNIT Defendants; Defendants Crutchley, Dipaola, John Doe No. 42, John Doe No. 43, And John Doe No. 44; T.E.A.M.S. Central Defendants; T.E.A.M.S. South Defendants; Defendants Botti, Bucchere, Poulton, Klagg, Perry, Fiorello, And Lawyer; And Defendants John Doe No. 45, John Doe No. 46, John Doe No. 47, John Doe No. 48, John Doe No. 49, And John Doe No. 5;

**COUNT IX:** VIOLATION OF FOURTEENTH AMENDMENT SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 against T.E.A.M.S. Centrial Defendants; T.E.A.M.S. South Defendants; Defendants  Leone, Barlow, Hoppe, Georgesion, Carnival, Stojanov, Paret, Gorman, John Doe 39, John Doe 40, John Doe 41, John Doe. 42, John Doe 43, John Doe 44, John Doe 45, John Doe 46, John Doe 47, John Doe 48, John Doe 49, John Doe 50, Bucchere, Poulton, Klagg, Perry, Fiorello, Jones, Orange, Rutkowski, Harty, Cresong, Colligan, Deperi, Lake, And Palladino;

**COUNT X:** MONELL CLAIM SURVIVAL AND WRONGFUL DEATH PURSUANT TO 42 U.S.C. §1983 against Mount Laurel Township and Chief Dennis A. Cribben In His Official Capacity;

**COUNT XI:** WRONGFUL DEATH against All Defendants;

**COUNT XII**: SURVIVAL ACTION PLAINTIFFS against All Defendants.

The pending motions to dismiss followed.

###### III.      **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a claim based on "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A complaint should be dismissed pursuant to Rule 12(b)(6) if the alleged facts, taken as true, fail to state a claim.  Fed. R. Civ. P. 12(b)(6).  When deciding a motion to dismiss pursuant to Rule 12(b)(6), ordinarily only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint, are taken into consideration. See U.S. Express Lines, Ltd., 281 F.3d at 388; Chester County Intermediate Unit v. Pa. Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990).  It is not necessary for the plaintiff to plead evidence.  Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977).  The question before the Court is not whether the plaintiff will ultimately prevail.  Watson v. Abington Twp., 478 F.3d 144, 150 (2007).  Instead, the Court simply asks whether the plaintiff has articulated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility[4] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Twombly</u>, 550 U.S. at 556).  "Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  <u>Iqbal</u>, 556 U.S. at 679.

The Court need not accept "'unsupported conclusions and unwarranted inferences,'" <u>Baraka v. McGreevey</u>, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted), however, and "[l]egal conclusions made in the guise of factual allegations . . . are given no presumption of truthfulness." <u>Wyeth v. Ranbaxy Labs., Ltd.</u>, 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)); <u>see also</u> <u>Kanter v. Barella</u>, 489 F.3d 170, 177 (3d Cir. 2007) (quoting <u>Evancho v. Fisher</u>, 423 F.3d 347, 351 (3d Cir. 2005) ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to

---

[4] This plausibility standard requires more than a mere possibility that unlawful conduct has occurred.  "When a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"" <u>Id.</u>

dismiss.")).  Accord Iqbal, 556 U.S. at 678-80 (finding that pleadings that are no more than conclusions are not entitled to the assumption of truth).

Further, although "detailed factual allegations" are not necessary, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  Twombly, 550 U.S. at 555 (internal citations omitted).  See also Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Thus, a motion to dismiss should be granted unless the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)."  Twombly, 550 U.S. at 556 (internal citations omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'-'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Finally, "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."  Great Western Mining &

<u>Mineral Co. v. Fox Rothschild LLP</u>, 615 F.3d 159, 174 (3d Cir. 2010) (internal citation and quotation omitted; emphasis added).

## IV.   <u>Analysis</u>

The Complaint as drafted is, at times, replete with conjecture, speculation, and legal conclusions.  In addition, it presents a case that appears to escalate from a "911" call response, to a suicide prevention, and then possibly to an active shooter scenario without much explanation as to why, other than challenges to the mistaken and/or fraudulent accounts by the police. To accomplish this, Plaintiffs inartfully weave portions of certain police documents for the dual purpose of setting certain timelines and then challenging the contents therein in a manner that attempts to discount the narrative.  In other words, the Complaint is drafted as an opposition to the police reports.  Further complicating matters is that the Defendants' primary grounds for attack sound in arguments which lean toward summary judgment.  This is understandable as the reports attached to the moving brief suggest different facts than those set forth in the Complaint. Against the backdrop of reports, Defendants forcefully argue that Plaintiffs

have distorted the timeline and left out vital information contained in the multiple police reports.[5]

According to Defendants, the series of events, particularly that Decedent discharged a shot when his brother was in the house and then later shot at police before Defendants discharged chemical munitions, changes the context of the police response as objectively reasonable and worthy of qualified immunity.  Moreover, Defendants state that Plaintiffs leave a lot of information out of the Complaint.  Thus, on these motions to dismiss, the Court is left to consider what appears to be claims plead in the Complaint that may be predicated upon loose facts and vulnerable to summary judgment.

As discussed at the hearing, the Complaint fails to state whether the Defendants are being sued in both their individual and personal capacities. To the extent claims are brought in their official capacities, Plaintiffs agree that these claims are dismissed as it is well established that the state

---

[5] A police report and a medical examiner's report are attached as exhibits to State Defendants' moving brief and Plaintiffs appear to refer to portions of these documents does not rely on the documents in support of their case. See SAC ¶¶ 86-102 (References to Orange's narrative, dispatch, Burlington County Central Communications).  In an attempt to place the alleged overreaching by the police into context, the Complaint attempts to distinguish facts in certain police documents from those plead.  In this regard, Defendants' argument that the Complaint relies on these documents misses the mark as the Complaint does not rely on the documents. Compare City of Roseville Emples. Ret. Sts. v.EnergySolutions, Inc., 814 F.Supp.2D 395, 425 (Sept. 30, 2011 S.D.N.Y) ("when the plaintiffs' allegation is refuted by the document on which it relies, it cannot be considered plausible.") (citation omitted). Instead, it attempts to challenge the contents of these documents.

entities and state employees are not "persons" amenable to suit under 42

U.S.C.§ 1983.  The Court will address the remaining issues in turn.

## A. [119] State Defendants' Motion to Dismiss the Second Amended Complaint

The State Defendants raise several points in favor of dismissal.  The

arguments are generalized and do not follow each count as plead in the

Second Amended Complaint.

Plaintiff's Constitutional claims are governed by Title 42 U.S.C. §

1983, which provides a civil remedy against any person who, under color of

state law, deprives another of rights protected by the United States

Constitution. See Collins v. City of Harker Heights, 503 U.S. 115, 120, 112

S.Ct. 1061, 117 L.Ed.2d 261 (1992). Any analysis of 42 U.S.C. § 1983 should

begin with the language of the statute:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

See 42 U.S.C. § 1983.  As the above language makes clear, Section

1983 is a remedial statute designed to redress deprivations of rights secured

by the Constitution and its subordinate federal laws. See Baker v. McCollan, 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). By its own words, therefore, Section 1983 "does not ... create substantive rights." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing McCollan ).

To state a cognizable claim under Section 1983, a plaintiff must allege a "deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing Kneipp v. Teder, 95 F.3d 1199, 1204 (3d Cir. 1996)). Thus, a plaintiff must demonstrate two essential elements to maintain a claim under § 1983:(1) that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that plaintiff was deprived of her rights by a person acting under the color of state law. Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).

There is no dispute that the Defendants were acting under color of state law. Defendants' arguments in favor of dismissal are predicted upon the fact that Plaintiff has failed to plead a constitutional violation.

To state a claim for false arrest or improper seizure under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2)

17

that the arrest was made without probable cause.  See Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995); Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir. 1988).  In California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991), the Supreme Court explained that "[a]n arrest requires either physical force ... or, where that is absent, submission to the assertion of authority." (emphasis in original).

A seizure occurs "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." I.N.S. v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984), (internal quotations omitted).  "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotation marks omitted); see also Berg v. Cnty. of Allegheny, 219 F.3d 261, 269 (3d Cir. 2000) ("A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement.").

Here, the Complaint alleges that Decedent was arrested and/or seized by the Defendants' militaristic show of authority.  "[T]he test for existence

18

of a 'show of authority' is an objective one: not whether the citizen perceived that [s]he was being ordered to restrict [her] movement, but whether the officer's words and actions would have conveyed that to a reasonable person." Hodari D., 499 U.S. at 626; United States v. Smith, 575 F.3d 308, 313 (3d Cir. 2009); see also United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006). There are several factors courts consider to determine whether, under the circumstances, an arrest or seizure has occurred, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); see also United States v. Drayton, 536 U.S. 194, 204, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (concluding that the defendant was not seized because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice").

A claim for excessive force claim is reviewed under an objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).  Under this standard, the Court must

pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396, 109 S.Ct. at 1872; see also Groman, 47 F.3d at 634.  "The calculus of reasonableness must embody allowance for the fact that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " Id. at 396–97, 109 S.Ct. at 1871–73; see also Sharrar v. Felsing, 128 F.3d 810, 820–21 (3d Cir. 1997).

Finally, Defendants claim they are entitled to qualified immunity, which attaches to all law enforcement officials who "reasonably but mistakenly" conclude that their conduct comports with the requirements of the Fourth Amendment.  Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 536 (1991). Qualified immunity may be considered on a motion to dismiss and in that posture a court considers whether the Complaint sets forth claims that "the officer's conduct violated a constitutional right" and "whether the right was clearly established."  Saucier v. Katz, 533 U.S. 194, 201 (2001). It follows that the officer's subjective beliefs about the legality of his or her conduct generally "are irrelevant." Anderson, 483 U.S. at 641,

20

107 S.Ct. at 3040; <u>see also</u> <u>Grant v. City of Pittsburgh</u>, 98 F.3d 116, 123–24 (3d Cir. 1996); <u>Sharrar</u>, 128 F.3d at 826 (3d Cir. 1997)

Having ruled on some of the claims during the hearing, the Court will address the State Defendants' remaining arguments in turn, and construes the facts as plead in the Complaint, and inferences therefrom, in Plaintiffs' favor.

1. <u>Plaintiffs' Claims Against State Defendants Should Be Dismissed With Prejudice Because They Do Not Allege Specific Facts Establishing Personal Involvement.</u>

State Defendants claim that the Complaint fails to sufficiently allege that individual officers personally violated Decedent's constitutional rights. While the Complaint is thin as to the specific involvement of each of the nearly 75 officers at the scene, it sufficiently sets forth the conduct of each officer. <u>See</u> <u>Parratt v. Taylor</u>, 451 U.S. 527, 537 n. 3, 101 S.Ct. 1908, 1913 n. 3, 68 L.Ed.2d 420 (1981); <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1077, 1082 (3d Cir. 1976). Viewing the facts as plead in the complaint as true, there is a question as to whether any police response was necessary, and even if it was, the nature of the response raises questions. If Harry Brown is to be believed and the facts are as plead, the police were assured that all was well and that no shot was fired by Decedent when Harry went to check on him. In addition, the complaint does not set forth what Radano

told the police with respect to Decedent or whether there was further conversation.  Under the set of facts proffered in the Complaint, it does not appear that Decedent "barricaded" himself in the house or was uncooperative with the initial officers.  As plead, the Complaint does not infer that a stand-off began or that Decedent was uncooperative at the time the initial officers responded to the 911 call.

A defendant in a civil rights action must have personal involvement in the alleged wrongs. Parratt v. Taylor, 451 U.S. 527, 537 n. 3, 101 S.Ct. 1908, 1913 n. 3, 68 L.Ed.2d 420 (1981). Personal involvement here is sufficiently plead through the allegations that each officer contributed to the situation. Discovery will shape the actions, or inactions, of each officer.  As plead the Complaint is sufficiently particular to each officer's involvement. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

Plaintiffs' allegation that State Defendants Barlow, Carnival, Georgeson, Gorman, Leone, Paret, and Stojanov, as members of the Crisis Unit, stayed in a command vehicle and relayed responses to negotiators and advice to Decedent to "thr[o]w the weapons in the residence out the window" is sufficient to allege a claim of arrest, excessive force, and seizure by show of force.  SAC ¶114; ¶130.  Also, to the extent that State Defendants DiPaola and Hoppe attempted to get Decedent to exit the residence, and

relayed requests that Decedent throw his firearms outside of the window are sufficient when coupled with the threats made by at State Defendants, Botti, Bucchere, Fiorello, Klagg, Perry, Poulton, Stickel to Decedent threatening him that if he did not come out of the residence "we have to come in, you know what is going to happen[.]" Id. These can reasonably be construed as a verbal threat of serious harm sufficient to allege a claim of unlawful arrest. Likewise, Plaintiffs allege some of the these officers shot gas canisters into the house before Decedent allegedly fired shots from the residence.[6] Id. at ¶140.  All of these claims, when taking the facts in the Complaint as true adequately allege a plausible claim that Defendants unlawfully arrested Decedent by "making an overwhelming show of military-type force" and by "making an arrest of the decedent without probable cause by firing large amounts of military grade chemical munitions into the decedent's residence." Id. at ¶188a, ¶188c.

With respect to State Defendants Lawyer, Gallagher, Kerstetter, Logan, Poskay, Reader, Walsh, these officers were present part of the TEAMS  Central Unit.  Id.  ¶109.  These individuals followed a robot that entered house after Decedent refused to come out because he was afraid.

---

[6] Confusingly, Plaintiffs argue that Decedent never fired at police or from the residence.  However, Plaintiffs then theorize that if he did fire shots, they were not aimed at police, but to open the window so he could breathe and release the chemicals from the room.  This is conjecture and speculation and the Court will construe the Complaint to allege that Decedent never fired any shots while in the residence at any time.

Id. at ¶141, ¶147. These individuals corrected the robot that was used to relay photos of the interior.  Given that the timing of the entry is unclear, this claims stands.

Also part of the T.E.A.M.S. Central Unit, State Defendants D'Angelo, Byrne, Fowler, Hendrickson, Graeber were located in the BEARCAT. Id. at ¶109, ¶122, ¶147.  These individuals also unsuccessfully attempted to use a battering ram to enter the residence.  Id. at ¶141, ¶147.   D'Angelo is alleged to be one of the defendants who developed a tactical plan to gain entry in to the barricaded residence. Id. ¶118.

The officers identified by their badge numbers, 5305, 5617, 6087, 6122, 6274, 6581, 6217, are alleged members of the T.E.A.M.S. South Unit. The Complaint alleges that these officers were on the scene, possibly spoke on a loud speaker, and/or may have launched a gas canister into the residence. Id. at ¶111.  Such speculation is insufficient to assert a cognizable claim.

With respect to State Defendants Crutchley, Vega, and Walsh, Plaintiffs alleged these officers were a sniper/scout team that were deployed after Decedent fired numerous shotgun rounds at officers.[7] Id. at

---

[7] Again, the Complaint references the alleged shots fired by Decedent for purposes of timing, but disputes that shots were fired.

¶110, ¶142.   Such a show of force is sufficient, under these facts to state a cognizable claim of arrest, seizure and excessive force.

Notwithstanding the official Burlington County Coroner's determination that Decedent's cause of death was from a self-inflicted gunshot wound, Plaintiffs contend that Decedent "may have been killed by sniper fire." Id. at ¶149; Ex. A.  However, Plaintiffs offer nothing but speculation.  See Rode, supra, 845 F.2d 1195. To the extent the actions of the officers caused the death of Decedent by any means, Plaintiffs' claim may be construed under the state created danger theory, as discussed infra.

The Court notes that under the facts as plead, the decision to employ the tactical teams and the overwhelming police response to a mental health concern, which was ultimately allayed, raises questions over the scope and severity of the police response and the reasonableness of the decision to employ the tactical units.  See Estate of Smith v. Marasco, 318 F.3d 497, 516 (3rd Cir. 2003) (discussing Estate of Escobedo v. Martin, 702 F.3d 388 (7th Cir. 2012) ("The ultimate question [was] whether the decision to activate [the SWAT team] and [the SWAT team's] subsequent actions were objectively reasonable responses to this situation.")  As plead, the Complaint sets for a cognizable claim of excessive force, albeit one that may prove fragile on a summary judgment motion.  See Estate of Escobedo v.

<u>Hunter</u>, No. 1:05-CV-424-TLS, 2011 WL 2133786, at *5 (N.D. Ind. May 27,
2011) (considering the viability of a claim of excessive force where the use
"employment of a tactical solution when an individual is suicidal, armed
with a firearm, high on drugs, not making threats against anyone but
himself, but also not progressing toward a peaceful resolution.")

> **Point II**: <u>Plaintiffs Claims Of Unlawful Entry And Unreasonable
> Seizure Must Be Dismissed Has They Have Failed To State A Claim
> Against State Defendants Upon Which Relief Can Be Granted</u>

For the same reasons as stated above, Plaintiffs sufficiently allege
claims of unreasonable seizure and unlawful entry.  Under a totality of the
circumstances review, Plaintiffs allege sufficient facts that demonstrate that
Decedent was unfree to move and a seizure occurred. <u>Bostick</u>, 501 U.S. at
437, 111 S.Ct. 2382; <u>United States v. Crandell</u>, 554 F.3d 79, 86 (3d Cir.
2009). <u>James v. City of Wilkes-Barre</u>, 700 F.3d 675, 680 (3d Cir. 2012)

Based on the information in the complaint, the facts show that
Defendants effectuated a warrantless arrest and/or seizure absent exigent
circumstances.  SAC at ¶188a-d. Given the long duration of the incident,
particularly the amount of time that passed between the 911 call and the
summoning of support forces, Defendants had ample time to get a warrant.
<u>Id.</u> at ¶147a-f.  The Complaint alleges the police responded to a concern
over the health of the Decedent and concerns about a gun that were

retracted and knowing that the gun Decedent did once possess had been removed from the residence.  Against this factual backdrop, "when a SWAT team surrounds a residence with machine guns pointed at the windows and the persons inside are ordered to leave the house . . . .  an arrest has undoubtably occurred."  Sharrar, 128 F.3d at 819–20.  Much like the facts in Sharrar, here "[th]ere was a clear show of physical force and assertion of authority. No reasonable person would have believed that he was free to remain in the house. We hold that under these circumstances the arrests occurred[.] Id. (citing United States v. Al–Azzawy, 784 F.2d 890, 893 (9th Cir.1985) (arrest occurred in the home when police surrounded the residence and ordered the person out with a bullhorn), cert. denied, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); United States v. Maez, 872 F.2d 1444, 1450 (10th Cir. 1989) (where SWAT team surrounded trailer with rifles pointed and ordered suspect to exit, arrest occurred in home despite lack of physical entry). Under these circumstances as plead, "the police were required to have secured an arrest warrant[.]" Id. (citing Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. at 1382 (1980).

**POINT III**: <u>Plaintiffs Claims Of Excessive Force Must Be Dismissed Has They Have Failed To State A Claim Against State Defendants Upon Which Relief Can Be Granted</u>

Plaintiffs' claim that Decedent's cause of death was not suicide, but caused by a sniper's bullet.  In this regard, Plaintiffs' claim contradicts the Burlington County Medical Examiner's conclusion that the manner of death was self-inflicted gunshot wound to the head.  Such a contradiction has the force of weakening plausibility, however, to the extent the facts are taken as true on a motion to dismiss, Defendants' argument is more appropriately made on a motion for summary judgment.

**POINT IV:** <u>Plaintiffs Have Failed To State A Claim Under The Fourteenth Amendment Against State Defendants Upon Which Relief Can Be Granted</u>

Defendants move to dismiss Plaintiffs' claims insofar as they seek remedy pursuant to a state created danger theory of liability.  Plaintiffs inartfully plead a claim alleging a substantive due process violation under the Due Process Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law").

There is an indisputable "constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224,

235 (3d Cir. 2008). This liberty interest is protected because "[t]he touchstone of due process is protection of the individual against arbitrary action of government." Stolzer v. City of Philadelphia, 2003 WL 22299251, at *2 (E.D.Pa. Sept. 30, 2003) (citing Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). Notwithstanding that interest, the Due Process Clause places no positive obligation on the State to ensure the safety of, or otherwise affirmatively protect, its citizens. Phillips, 515 F.3d at 235 (citing DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 196–197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)) (rejecting the view that the Constitution imposes "affirmative obligations" on the State, and holding that "the State cannot be held liable under the [Due Process] Clause for injuries that could have been averted had it chosen to provide them."). The reasoning that informs this conclusion is the original intent of the Due Process Clause. See DeShaney, 489 U.S. at 196, 109 S.Ct. 998 (observing that the Due Process Clause was designed "to protect the people from the State, not to ensure that the State protected them from each other."); accord Jackson v. City of Joliet, 715 F.2d 1200, 1203 (7th Cir.1983) ("The Fourteenth Amendment ... sought to protect Americans from oppression by state government, not to secure them basic governmental services.").

Significantly, the Third Circuit recognized an exception to this rule when it adopted the state created danger theory. See Kneipp, 95 F.3d at 1211 (holding "that the state created danger theory is a viable mechanism for establishing a constitutional claim under 42 U.S.C. § 1983."). Under that theory, "the state may assume responsibility for the safety of an individual for whom it affirmatively creates or enhances a risk of danger." Kaucher, 455 F.3d at 431 (emphasis added). Four elements are required to allege a cognizable claim:(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. Id. (citing Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006)); see also Caissie v. City of Cape May, 619 F. Supp. 2d 110, 117–18 (D.N.J. 2009).

Defendants, without conceding that Plaintiffs have sufficiently alleged any of the elements established in Bright, argue that there is no evidence to

satisfy the first, second or fourth elements of the test.  Although Defendants' arguments may carry force on summary judgment, under the facts as plead in the Complaint on a motion to dismiss, the Court finds that the elements are sufficiently plead.  Specifically, giving the Plaintiff the benefit of each inference and factual certainty, if the police response was made in an attempt to aid a potentially suicidal victim whose well-being was assured by his brother, then a plausible claim that is "conscious shocking" is alleged. Schieber v. City of Philadelphia, 320 F.3d 409, 417 (3rd Cir. 2003). Given the alleged timeline of events, which includes the introduction of chemical munitions before any alleged gunfire by Decedent, Plaintiffs have alleged the State Defendants "performed an affirmative" act rather than mere inaction. DeShaney, 489 U.S. at 282.

Moreover, there is the alleged relationship between the state and the plaintiff and the opportunity for harm to the Decedent have been sufficiently plead. Morse v. Lower Merion School District, 132 F.3d 902 (3d Cir. 1997).  The Court note that while the Complaint is at times speculative, conclusory, inconsistent with facts proffered by Defendants, and, therefore vulnerable to attack, such challenges must be on summary judgment. On this motion to dismiss, the Court finds that Plaintiffs have articulated "enough facts to state a claim to relief that is plausible on its face" under a

state created danger theory.  Twombly, 550 U.S. at 570.  For these reasons,

State Defendants' motion is denied in part.


### B. [122] Mount Laurel Defendants' Motion to Dismiss the Second Amended Complaint

Mt. Laurel generally adopts the same arguments made by the State

Defendants with respect to lack of specificity as to individual action.  In

addition, Mt. Laurel argues that the Monell claim fails because Plaintiffs do

not identify any policies that contributed to Decedent's death.

### 1.    Mt. Laurel Monell Claim

In Count X of the Complaint, Plaintiffs' claim pursuant to Monell v.

Department of Social Services, 436 U.S. 658 (1978), will be dismissed for

failure to specify the custom, policy, or practice that caused Decedent's

injury.

Mount Laurel is a municipality. A municipality is not liable under 42

U.S.C. § 1983 on a respondeat superior theory. Monell, 436 U.S. 691.

However, a government entity may be liable for its agent's actions upon a

demonstration that a policy or custom of the municipality caused, or was a

"moving force" behind, the alleged violation of Plaintiff's rights. Kentucky v.

Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting

Polk County v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)); Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). Thus, in order to prevail against the government entity, "[a] plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." Losch v. Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984). Further, a plaintiff must show that the municipality acted with "deliberate indifference" to the known policy or custom. Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "A showing of simple or even heightened negligence will not suffice." Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. at 397, 407 (1997).

Courts have created a "two-path track to municipal liability... depending on whether the allegation is based on municipal policy or custom." Mulholland v. Gov't Cnty. of Berks, 706 F.3d 227, 237 (3d Cir. 2013) (quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996)). A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." Kneipp, 95 F.3d at 1212 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)). A custom is an act "that has not been formally

approved by an appropriate decision maker," but that is "so widespread as to have the force of law." Bryan County v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Municipalities are not liable for acts of police officers unless a municipal policy or custom amounts to a "deliberate indifference to the rights of people with whom the police come into contact." Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)). Deliberate indifference means that" 'a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." Harris, 489 U.S. at 389 (quoting Pembaur, 475 U.S. at 483-84 (1986) (plurality) (Brennan, J.)). Thus, a municipality's inadequate training or supervision does not give rise to liability unless city policymakers are "on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights ... [and they] choose to retain that program." Connick v. Thompson, 131 S.Ct. 1350, 1359- 1360 (2011).

Similarly, widespread behavior by police officers does not amount to a municipal custom unless there is "knowledge and acquiescence by the decisionmaker." McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009) (citing Watson v. Abington Tp., 478 F.3d 144, 156 (3d Cir. 2007))

(further citation omitted). Finally, the plaintiff must also show that the

alleged policy or custom was the proximate cause of the injuries suffered.

Watson, 478 F.3d at 156 (citing Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d

Cir. 1990) (further citation omitted)).

Here, the Complaint simply alleges the following:

Defendants, Dennis A. Cribben, in his official capacity, and
Mount Laurel Township, directly and proximately caused the
violations of plaintiffs' decedent, David K. Brown's,
Constitutional rights by the defendant Mount Laurel Township
police officers, including Defendant Cribben, acting in their
individual capacities through the Township's customs and
practices whereby the Township with deliberate indifference
tolerated and permitted a pattern of deprivation of Fourth
and Fourteenth Amendment rights by its police officers, failed
to maintain proper system for and practice of review, and failed
to properly sanction or discipline police officers, including
the individual Mount Laurel Police Officer defendants in this
case, for violations of the constitutional rights of citizens
under the Fourth Amendment (as applied to the states
through the Fourteenth Amendment) to be free from
unreasonable seizure and excessive force and to freedom
from deprivation of their life, liberty, and property without
due process of the laws under the Fourteenth Amendment, with
the result that police officers from Mount Laurel Township were
encouraged to believe that they could violate the rights of persons
such as the plaintiff with impunity.

(SAC ¶212).

To survive a motion for to dismiss, Plaintiffs "must identify a

custom or policy, and specify what that custom or policy was."

McTernan, 564 F.3d at 658. "[A] single incident of unconstitutional

activity is not sufficient to impose liability under <u>Monell</u> [.]" <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (<u>Connick</u>, 131 S.Ct. at 1359- 1360; <u>see</u> <u>Ingram v. Twp. of Deptford</u>, 911 F.Supp.2d 289, 302 (D.N.J. 2012) (finding plaintiff's Monell claim deficient where the complaint cited an unconnected past incident of excessive force.).

Plaintiffs' generalized claim and formulaic recitation of the elements of a claim under <u>Monell</u> fall woefully short of the pleading standard and Count X is dismissed without prejudice.

### 2.    **Individual Defendants**

The Second Amended Complaint alleges that Officers Jones, Orange Rutkowski, Harty, Cresong and Colligan personally arrested the decedent by creating a hard perimeter.  Plaintiffs, in Count III, add DiPeri, Palladino, Carp, Michigan, and Howard to this cause of action and factual claim.  For the same reasons articulated with respect to the State Defendants, Mount Laurel Defendants' motion to dismiss is denied.

Plaintiffs's claims against Cribben, Modugno, Howard, Riedener, Dever, Pincus, Palladino, Rudderow and John Doe Officers 1-9, for ordering the call to the TEAMS unit lacks specificity.  Plaintiffs' failure to

set forth how each officer violated the Decedent's constitutional rights is fatal to the claims with respect to these defendants.

## V.   Conclusion

For the reasons stated on the record during the hearing and those set forth above, State Defendants' Motion to Seal Documents Containing Medical Records and Autopsy Reports [118] is granted, State Defendants' Motion to Dismiss the Second Amended Complaint is denied in part [119], Mount Laurel Defendants' Motion to Dismiss the Second Amended Complaint is granted and denied in part [122], Plaintiff's Motion to Dismiss Mount Laurel Township Defendants' Motion to Dismiss Second Amended Complaint is denied [124], and Plaintiffs' Motion for Leave to file a sur-reply [129] is dismissed as moot.


An appropriate Order shall issue.


Dated: September 21, 2016


                                        s/ Joseph H. Rodriguez
                                        Hon. Joseph H. Rodriguez,
                                        UNITED STATES DISTRICT JUDGE